Andrew Rozynski, Esq. (NY 5054465)
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
arozynski@eandblaw.com
*Attorneys for Plaintiff*

Mary Vargas (PA 324005)
Stein & Vargas, LLP
1717 K Street NW, Suite 900
Washington, DC 20006
240-793-3185 (tel.)
888-778-4620 (fax)
*Local Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

---------------------------------------------------------------

| | |
|---|---|
| DR. JOSEPH MICHAEL VALENTE, | **Case No.** |
| Plaintiff, | |
| v. | **COMPLAINT** |
| THE PENNSYLVANIA STATE UNIVERSITY | **JURY TRIAL DEMANDED** |
| Defendant. | |

---------------------------------------------------------------

Plaintiff JOSEPH VALENTE, by and through his undersigned counsel, EISENBERG &

BAUM, LLP and STEIN & VARGAS, LLP hereby files this Complaint against Defendant and

alleges as follows:

## PRELIMINARY STATEMENT

1.      This civil rights action seeks to remedy the systematic disability discrimination and

retaliation perpetrated by Penn State against Dr. Valente, its first tenured professor who is deaf.

Despite his distinguished academic career and demonstrated excellence in teaching, research, and

service, Penn State has engaged in a pattern of discriminatory conduct that undermines Dr. Valente's ability to perform his professional duties and participate fully in university life.

2.      For nearly a decade, Dr. Valente successfully carried out his academic responsibilities with the accommodation of two full-time American Sign Language (ASL) interpreters. Without justification or engaging in any meaningful interactive process, Penn State unilaterally revoked this long-standing accommodation in 2021, replacing it with an inadequate framework that severely impairs Dr. Valente's ability to fulfill his professional obligations.

3.      When Dr. Valente sought to restore his legally protected accommodations, Penn State escalated its retaliation against him, creating a hostile work environment. The university canceled his graduate courses, obstructed his grant-funded accommodations, interfered with human subjects research, and excluded him from faculty governance. Penn State also imposed restrictions on his travel, required him to pay for accommodations, and implemented procedural and budgetary barriers to interpreter access, including removing his designated ASL interpreter from key meetings and enforcing ineffective interpreter rotation policies.

4.      Further, Penn State engaged in systemic efforts to undermine Dr. Valente's ability to perform his work by restricting his access to outside ASL interpreting agencies, delaying reimbursements for grant-related expenses, and offering substandard pay for contract interpreters.

5.      In January 2025, after the DOJ had issued its right to sue and immediately following Dr. Valente's formal response raising discrimination and retaliation concerns in response to Penn State's memorandum raising dubious performance issue, the university intensified its retaliatory actions. Penn State's Office of Ethics launched an administrative investigation against Dr. Valente and placed him on administrative leave, prohibiting him from teaching, contacting students, or accessing campus. This action effectively cut off his unrelated grant funding, preventing him from

completing a critical phase of his project. As a result, Penn State's actions have marginalized Dr. Valente within the academic community, caused significant project delays, and inflicted financial harm.

6.     Through this action, Dr. Valente seeks to vindicate not only his own rights under federal disability law, but also to ensure that Penn State fulfills its legal obligations to provide reasonable accommodations to faculty members with disabilities and maintain an academic environment free from discrimination and retaliation.

## JURISDICTION & VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this case arises under federal law, specifically Title I and Title V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 et seq..

8.     Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b) because the acts and omissions giving rise to Plaintiff's claims occurred within this judicial district, Defendant maintains its principal place of business within this district, and the records relevant to this action are maintained within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9.     Plaintiff has satisfied all procedural and administrative prerequisites to filing suit. He timely filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), received a Notice of Right to Sue dated November 19, 2024, and has filed this action within the required 90-day period

## THE PARTIES

10.    Plaintiff Dr, Joseph Valente is a deaf individual residing in Pennsylvania. He communicates effectively through multiple methods, including American Sign Language (ASL), lip-reading, written communication, and various assistive technologies. His hearing loss substantially limits the major life activity of hearing as defined by federal anti-discrimination laws, qualifying him as an individual with a disability under the ADA.

11.    Dr. Valente holds a Ph.D. in Curriculum and Instruction with an emphasis in Special Education and Educational Anthropology from Arizona State University. Throughout his career at Penn State, he has maintained an exemplary record of teaching, research, and service. He has held multiple distinguished positions at the university, including Professor-in-Charge of the Early Childhood Education Program, Co-Director of Penn State's Center for Disability Studies, Core Faculty in the university-wide Comparative & International Education program, and Affiliate Faculty at the Pennsylvania Center for Folklore.

12.    Defendant The Pennsylvania State University is a public, state-related institution of higher education that receives substantial federal financial assistance. Penn State maintains its principal place of business in University Park , Pennsylvania, employs more than 500 employees, and is engaged in an industry affecting commerce. As such, Penn State is subject to Title I and Title V of the ADA, as well as Section 504 of the Rehabilitation Act.

## STATEMENT OF FACTS

13.    Plaintiff Dr. Joseph Valente is deaf and has been employed as a tenure-track Assistant Professor of Education at Pennsylvania State University ("Penn State" or "the University") since 2010, where he has maintained an exemplary record of teaching, research, and service, earning tenure and promotion to the rank of Associate Professor of Education in 2017.

14.     Dr. Valente holds a Ph.D. in Curriculum and Instruction with an emphasis in Special Education and Educational Anthropology from Arizona State University and currently serves as an Associate Professor of Education at Penn State.

15.     Dr. Valente has earned multiple distinguished positions at Penn State, including Professor-in-Charge of the Early Childhood Education Program, Co-Director of Penn State's Center for Disability Studies, Core Faculty in the university-wide Comparative & International Education program, and Affiliate Faculty at the Pennsylvania Center for Folklore, demonstrating his significant contributions to the academic community.

16.     Dr. Valente's deafness substantially limits his major life activities of hearing and communicating, qualifying him as an individual with a disability under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Pennsylvania Human Relations Act.

17.     Upon his initial employment in 2010, Penn State recognized Dr. Valente's need for reasonable accommodations to perform the essential functions of his position as a tenure-track and later tenured faculty member.

18.     In 2013 and 2014, after a comprehensive three-year interactive process documenting effective accommodations, Penn State formally approved and implemented a comprehensive accommodation plan providing Dr. Valente with two full-time designated American Sign Language ("ASL") interpreters to ensure effective communication access.

19.     Penn State's initial accommodation plan also included three backup interpreters who were familiar with Dr. Valente's work and academic subject matter, ensuring continuous coverage when primary interpreters were unavailable.

20.     From 2013 through 2019, the two-interpreter accommodation system enabled Dr.

Valente to perform all essential aspects of his position, including teaching, research, and service; however, its implementation was inconsistent and placed undue financial and administrative burdens on him that should have been managed by the university. Despite its necessity for effective communication, Dr. Valente was forced to navigate bureaucratic obstacles, handle billing issues, and advocate for his own accommodations, diverting significant time and energy from his professional duties.

21.     During this six-year period, Dr. Valente's interpreter accommodation allowed him to successfully teach undergraduate and graduate courses, advise Ph.D. students, and participate in faculty meetings; however, Penn State's inconsistent provision of services prevented him from fully engaging in his responsibilities. After another round of lengthy advocacy effort with high-level university administrators and yet another interactive process, Penn State hired Gary Thomas as its first university-wide staff ASL interpreter, recognizing the need for consistent accommodations to remove these barriers.

22.     Despite these challenges during this period, Dr. Valente consistently received favorable performance evaluations, successfully secured research grants, and received no significant complaints about his conduct or teaching effectiveness. But from 2019 through 2021 persistent issues with securing team ASL interpreters for Dr. Valente, as well as ongoing issues with financial and administrative responsibilities related to accommodations, still prevented him from fully engaging with his job duties as a tenured professor. Once again, Dr. Valente, along with Gary Thomas, led another lengthy advocacy effort with both College of Education and university-level administrators and went through yet another interactive process that ultimately led to the hiring of Gary Thomas as his designated ASL interpreter on or about July 1, 2021 in order to alleviate interpreter availability issues and bureaucratic responsibilities that posed barriers to his

ability to perform his essential job duties.

23.    In July of 2021, without engaging in any interactive process or consultation with Dr. Valente, Penn State notified Gary Thomas that they unilaterally decided to reduce ASL interpreting services to one full-time interpreter. Prior to July of 2021, it was indisputable that Dr. Valente needed two ASL interpreters and backups as documented in Penn State's 2013/2014 accommodations letter.

24.    In July, 2023 without interacting with Dr. Valente, Penn State implemented this reduction through a newly created "Reasonable Accommodation Framework" ("RAF"), which was developed and imposed without Dr. Valente's input, consent, or even prior notification.

25.    The July, 2023 RAF either revoked or diminished Dr. Valente's previously established and successful accommodation arrangement, which had been formally documented in the 2013-2014 accommodation agreement.

26.    The RAF imposes arbitrary restrictions on interpreter access based primarily on meeting size, disregarding crucial factors such as meeting duration, subject matter complexity, specialized academic vocabulary, and interpreter fatigue.

27.    The RAF fails to account for the specialized nature of academic discourse, the need for precise communication in educational settings, and the importance of continuous interpreter coverage for effective participation in academic activities and building rapport with students, colleagues, and staff.

28.    On information and belief, Penn State's decision to reduce Dr. Valente's accommodations was primarily motivated by financial considerations rather than any legitimate assessment of accommodation effectiveness or necessity (September 2021 to March 2023).

29.    Penn State's interpreter expenses are charged directly to the College of Education's

budget rather than a central University fund, creating an improper financial incentive to limit these federally mandated accommodations.

30.    The University's cost-driven approach to Dr. Valente's accommodations demonstrates a fundamental misunderstanding of its legal obligations under the ADA, Section 504, and the PHRA.

31.    After Penn State reduced his interpreter coverage, Dr. Valente immediately experienced significant barriers to performing his professional responsibilities, including difficulty scheduling meetings with students and collaborators, maintaining regular office hours, and participating in academic and faculty meetings.

32.    Dr. Valente promptly and repeatedly requested restoration of his previously approved accommodations, providing detailed explanations of why revoking or diminishing accommodations was inadequate for his academic responsibilities.

33.    In response to Dr. Valente's reasonable requests for restoration of proven effective accommodations, Penn State subjected him to unprecedented levels of scrutiny and criticism not imposed on other tenured faculty members.

34.    In Fall of 2023, Penn State faculty began soliciting and collecting alleged complaints against Dr. Valente from unnamed students and colleagues, while refusing to provide him with any specific information or evidence supporting these allegations.

35.    Penn State's collection and use of anonymous complaints against Dr. Valente represented a marked departure from standard University procedures for handling faculty concerns.

36.    Beginning in January of 2023, Penn State administrators conducted meetings with Dr. Valente ostensibly to discuss these collected allegations, but deliberately structured the meeting to disadvantage his participation.

37.    During a June 15, 2023 meeting with Dean Kimberly Lawless, Penn State specifically barred Dr. Valente's designated interpreter, Gary Thomas, from attending, despite Mr. Thomas's familiarity with the academic context and terminology.

38.    Penn State required Dr. Valente to rely on an unfamiliar remote ASL interpreter via Zoom while administrators met in person, creating significant communication barriers and disadvantaging his ability to participate fully in the meeting.

39.    Despite Dr. Valente's explicit requests, Penn State refused to provide an impartial note-taker or create a recorded transcript of the June 15 meeting, further compromising his ability to document and respond to the allegations presented.

40.    The University's deliberate structuring of the June 15 meeting effectively prevented Dr. Valente from meaningfully defending himself against the unsubstantiated allegations presented.

41.    In January, 2024, following Dr. Valente's continued advocacy for appropriate accommodations and his filing of external complaints, Penn State escalated its retaliatory actions by abruptly canceling his graduate-level course .

42.    The timing of the graduate course cancellation raises significant concerns, as it occurred immediately before three of Dr. Valente's Ph.D. advisees and one M.Ed. advisee withdrew from his advisement. On information and belief, Penn State administrators encouraged these students to seek alternative advisors, demonstrating a pattern of institutional efforts to isolate Dr. Valente.

43.    In January, 2024, on information and belief, Penn State administrators actively orchestrated the coordinated departure of Dr. Valente's Ph.D. students by encouraging them to seek alternative advisors.

44.     In Fall of 2023, multiple faculty members, acting on behalf of Penn State, approached Dr. Valente's Ph.D. students without solicitation, making unsubstantiated allegations about past mistreatment and pressuring them to switch advisors.

45.     The simultaneous departure of all Dr. Valente's Ph.D. and M.Ed. advisees, each citing suspiciously similar and non-specific reasons, strongly suggests coordinated action by Penn State administrators to isolate and marginalize Dr. Valente.

46.     The loss of his Ph.D. and M.Ed. advisees has severely impacted Dr. Valente's ability to maintain his standing as a graduate faculty member, which is critical for a research professor, especially for recruiting future Ph.D. students for teaching and research.

47.     In October, 2022 Penn State's targeted reduction in interpreter coverage has forced Dr. Valente to repeatedly reschedule or cancel critical meetings with students, faculty, staff, and others inside and outside the university that are an essential part of his teaching/advising, research and service responsibilities.

48.     Additionally, Penn State implemented a new policy substituting ASL interpreter accommodations with assistive technology (AI captioning) for faculty meetings, despite research and legal precedent recognizing that AI-generated captions often fail to provide accurate, contextually appropriate translations for complex academic discourse. This policy significantly diminished Dr. Valente's capacity to participate in faculty discussions and governance.

49.     The University has consistently refused to acknowledge the documented success of Dr. Valente's prior accommodation arrangement with two full-time interpreters, which enabled his full participation in academic activities for nearly a decade.

50.     Penn State's failure to provide adequate interpreter coverage for grant-related activities has jeopardized Dr. Valente's ability to meet grant obligations and forces him to use his

own grant funds to cover accommodations, depleting resources needed to fulfill existing grant-related commitments.

51.    The current accommodation framework effectively forces Dr. Valente to choose between fulfilling his teaching duties and maintaining his research and service obligations due to artificially limited interpreter availability.

52.    Penn State's revoking or diminishing of interpreter services has significantly impaired Dr. Valente's ability to participate in impromptu academic discussions that are typical of university life and urgent meetings emerging from faculty and student meetings, informal networking, and collaborative opportunities that are crucial for faculty developing rapport with students and colleagues and necessary for advancement.

53.    The University has arbitrarily limited Dr. Valente's budget for attending academic conferences needed for publishing and grant-related networking opportunities with adequate communication access annually, despite it being a regular practice for faculty to attend multiple conferences for satisfactory performance evaluations.

54.    Penn State's conference attendance accommodations restriction directly conflicts with the University's own long-held practice that tenured professors attend at least two conferences per year to meet basic performance expectations.

55.    Unlike his hearing colleagues, Penn State requires Dr. Valente to use his grant funds to cover interpreter services and travel expenses for conferences, grant-related work, and university-related networking effectively reducing his research budget relative to non-disabled faculty.

56.    The University's current interpreter scheduling system, which relies exclusively on the lone staff ASL interpreter for the entire university and contracted agencies, has created

persistent gaps in coverage for essential faculty meetings and classroom instruction, as well as has dictated Dr. Valente's availability for essential meetings that his hearing colleagues are not limited by.

57.     In Fall 2022, Penn State forced Dr. Valente to accept a non-certified interpreter for his classes right in the middle of his opening lecture, requiring him to waive his rights under PA Act 172 of 2006.

58.     The same issue with non-certified interpreters continued into Spring 2023, compromising the quality of Dr. Valente's instruction and communication access.

59.     Penn State administrators later used student comments from the Fall 2022 class, where a non-certified interpreter was provided, to allege teaching deficiencies in multiple instances: during meetings in January 2023 and June 2023, in a January 2025 memorandum from Dean Kim Lawless, and as evidence in an ongoing investigation by the Office of Ethics and Compliance, with interviews scheduled for February 2025.

60.     On March 2, 2023, Dean Kim Lawless proposed replacing qualified interpreters with unspecified assistive (AI-based) captioning technologies that were not ADA-compliant or suitable for Dr. Valente's situation, again demonstrating a fundamental disregard of Dr. Valente's needs and rights. Despite multiple prior meetings to educate her on why AI captioning alone would not suffice, the Dean insisted on substituting the qualified interpreters with AI captions in certain settings.

61.     On April 5, 2023, newly appointed University President Neeli Bendapudi visited the College of Education to address faculty and staff in a town hall-style meeting. Despite extensive consultations between ASL interpreter Gary Thomas and event organizers to ensure effective communication access for Dr. Valente, Penn State disregarded these recommendations

and implemented an exclusionary setup.

62.     Instead of providing the agreed-upon team ASL interpreters, the university placed a video monitor with AI-generated captions at the front of the room while positioning Mr. Thomas in a back corner. Initially, Dr. Valente was instructed to sit in the back, facing an exterior wall with the monitor, effectively isolating him from the discussion. This arrangement forced him to choose between viewing the captions and maintaining visual access to his interpreter, making full participation alongside his colleagues impossible.

63.     Despite these barriers, Dr. Valente rejected the inaccessible seating arrangement and instead positioned himself in the front row to directly face Mr. Thomas. However, the imposed last-minute changes—prioritizing cost-cutting over accessibility—still resulted in a fundamentally inadequate setup that denied him meaningful participation. This exclusion was particularly significant during the open Q&A session, where minoritized faculty raised concerns about long-standing inequities. Dr. Valente was effectively prevented from expanding the discussion to include the systemic exclusion of students, staff, and faculty with disabilities—an issue central to his role as a disability studies scholar and advocate.

64.     Following the event, Penn State further misrepresented the accessibility of the meeting by featuring a promotional photograph of Mr. Thomas interpreting next to President Bendapudi on the College of Education's homepage. This misleading depiction obscured the reality that Dr. Valente had been systematically excluded from full participation.

65.     Penn State imposed an arbitrary weekly 40-hour constraint on Mr. Gary Thomas, Dr. Valente's designated interpreter, without considering the actual time requirements of Dr. Valente's professional responsibilities.

66.     The 40-hour constraint on interpreter services creates artificial barriers to Dr.

Valente's workplace access that hearing faculty members do not face in their communications.

67.     In March/April of 2024, after Dr. Valente filed formal complaints about discrimination and retaliation, Penn State's administration further intensified scrutiny of his teaching methods and professional conduct including reporting him to the IRB Office that led to the revocation of his Human Subjects protocols negatively affecting his grant-funded projects, as well as creating new reimbursement processes without advanced notice or reasonable explanations and guidance that prevented him from receiving timely reimbursements for his granted-related work that exceeded thousands of dollars and placed an undue personal financial burden on him or risk falling behind on his funded-grant projects.

68.     In April 2023, a group of C&I faculty members drafted a letter to Dean Lawless outlining specific failures in providing effective accommodations to Dr. Valente. However, faculty members who participated in the drafting process later indicated that they were discouraged from submitting the letter after direct conversations with Professor Gail Bolt on behalf of Dean Lawless. On information and belief, faculty were subjected to administrative pressure, effectively silencing concerns about discriminatory practices

69.     Penn State began a coordinated effort to cast Dr. Valente as a problematic instructor, relying solely on unsubstantiated and anonymous complaints while ignoring his history of positive performance evaluations.

70.     Despite repeated requests, Penn State has consistently refused to provide specific details including the names of alleged complainants or direct evidence from complainants supporting any of the alleged complaints against Dr. Valente.

71.     The timing, nature, and coordination of adverse actions against Dr. Valente demonstrate a clear pattern of retaliation for his advocacy for legally mandated accommodations,

occurring immediately after key events, including the April 5, 2023, C&I Leadership meeting, where faculty leaders agreed to publicly address Dean Lawless' failure to provide accommodations through a letter-writing campaign, his October 2023 EEOC complaint, and most recently, the December 2024 Notice of Right to Sue issued by the Department of Justice Office of Civil Rights.

72.     Penn State's retaliatory actions have inflicted significant and potentially permanent damage to Dr. Valente's professional reputation within the academic community inside and outside of Penn State.

73.     The University's revocation and diminishing of accommodations and retaliatory conduct have directly interfered with Dr. Valente's ability to maintain his standing as a graduate faculty member and teach graduate-level courses.

74.     Penn State's actions have created substantial barriers to Dr. Valente's work productivity, significantly hindering his ability to pursue promotion opportunities that remain readily available to his hearing colleagues. These barriers have substantially and negatively impacted his professional advancement, limiting his access to the same career progression pathways as his peers.

75.     Dr. Valente's ability to develop future and ongoing grant-funded projects, including submissions to the National Science Foundation and the WT Grant Foundation, has been severely impacted by Penn State's ongoing discrimination and retaliation, particularly regarding Human Subjects Research protocols, reimbursement processes, and false accusations against him. The weekly burden of navigating these obstacles, including being forced to pay out of pocket while defending himself against baseless claims, has diverted his time and energy away from critical pilot and demonstration projects necessary for competitive grant applications, jeopardizing his ability to secure funding and advance his research.

76.    Penn State has repeatedly refused to engage in a meaningful interactive process regarding Dr. Valente's accommodation needs, as required by federal and state law.

77.    Penn State has failed to provide any updates or information regarding the status, progress, or outcomes of internal investigations into Dr. Valente's discrimination and retaliation complaints.

78.    Dr. Valente's request for Dr. Suzanne Adair's recusal from investigating his retaliation complaint, based on documented conflicts from prior interactions, has been ignored by Penn State.

79.    The University's current "Reasonable Accommodation Framework" fails to incorporate well-established best practices regarding interpreter fatigue and team interpreting requirements.

80.    The RAF demonstrates a fundamental misunderstanding of the complex linguistic and communication needs in academic settings by failing to account for extended or complex academic discussions.

81.    Penn State's RAF ignores the specialized terminology and technical language required in academic discourse and research presentations.

82.    Despite previously providing and funding two full-time interpreters for years, Penn State has now labeled this same accommodation as "excessive and unreasonable" without demonstrating any undue hardship.

83.    Penn State has failed to provide any factual or financial evidence supporting its claim that two full-time ASL interpreters would impose an undue burden on the University.

84.    The University's insistence on using unfamiliar conference interpreters provided by conference organizers significantly impairs Dr. Valente's ability to participate effectively in

academic discourse and professional networking.

85.     Penn State's refusal to provide consistent, qualified interpreter coverage has created substantial barriers to Dr. Valente's ability to secure recognition, research funding, and publishing opportunities.

86.     The University has refused to restore interpreter coverage for research and service activities that are explicitly required of research professors under Penn State's own policies.

87.     Penn State's actions demonstrate deliberate indifference to Dr. Valente's federally protected rights under the ADA and Section 504.

88.     The University's discriminatory conduct has caused Dr. Valente to experience severe emotional distress, anxiety, and professional isolation.

89.     Dr. Valente has suffered concrete and quantifiable professional harm, including disruption of his teaching responsibilities, research activities, and academic relationships.

90.     Penn State's actions have created ongoing barriers to Dr. Valente's professional advancement and academic career development.

91.     The University's conduct reflects a pattern of systematic discrimination and retaliations designed to marginalize and disadvantage Dr. Valente based on his disability status.

92.     Penn State's actions constitute unlawful discrimination under both the ADA, Section 504 of the Rehabilitation Act

93.     Dr. Valente has suffered and continues to suffer economic damages, including lost professional opportunities and potential grant funding, as a direct result of Penn State's unlawful conduct.

94.     Penn State's retaliatory actions have caused significant and potentially permanent damage to Dr. Valente's professional reputation and career prospects.

95.     The University's conduct demonstrates a willful and reckless disregard for Dr. Valente's legal rights and professional well-being.

96.     Penn State's systematic discrimination has fundamentally altered the terms and conditions of Dr. Valente's employment by creating artificial barriers to his full participation in academic life that his hearing colleagues do not have to deal with in their work life.

97.     The University's conduct has violated established academic norms and best practices regarding Dr. Valente has repeatedly educated them about using research- and scholarly-based publications about accommodations for deaf faculty members in higher education settings.

98.     Penn State has demonstrated a pattern of replacing effective accommodations with inadequate, less costly alternatives, contrary to the requirements of federal and state disability law.

99.     The University's actions have effectively segregated Dr. Valente from full participation in academic discourse and professional development opportunities.

100.    Penn State's conduct has created and maintained significant disparities between Dr. Valente's ability to perform his job duties and that of his hearing colleagues.

101.    The University's discriminatory actions have impeded Dr. Valente's ability to mentor students, particularly in specialized areas related to disability studies, inclusive education, early childhood education, comparative and international education, and educational anthropology.

102.    Penn State's retaliatory conduct has disrupted established academic relationships and collaborations that are essential for research productivity and professional advancement.

103.    The University has failed to provide any legitimate, non-discriminatory justification for its systematic dismantling of Dr. Valente's previously effective accommodation arrangements.

104.    Penn State's actions have created a hostile work environment that substantially

interferes with Dr. Valente's ability to perform his professional responsibilities.

105.    The University's conduct reflects a deliberate strategy to isolate and marginalize Dr. Valente within the academic community.

106.    Penn State's actions demonstrate an institutional unwillingness to fulfill its legal obligations under federal disability laws.

107.    The University's conduct has resulted in the loss of significant professional opportunities that would have advanced Dr. Valente's academic career.

108.    Penn State's actions have created substantial barriers to Dr. Valente's ability to compete for research funding on an equal basis with his colleagues due to his lack of work productivity and networking opportunities.

109.    The University's discriminatory conduct has impaired Dr. Valente's ability to fulfill his role as Co-Director of Penn State's Center for Disability Studies, as well as Core Faculty in the university-wide Comparative & International Education program.

110.    Penn State's actions reflect a fundamental failure to understand and implement the requirements of academic accommodation in higher education settings.

111.    The University's retaliatory conduct has disrupted and irreputably harmed Dr. Valente's ability to maintain and develop professional networks essential for academic success.

112.    Penn State's systematic discrimination has created ongoing barriers to Dr. Valente's full participation in academic governance and institutional service obligations.

113.    The University's actions have caused Dr. Valente to experience significant professional isolation and exclusion from academic discourse, including being barred from serving on hiring committees for tenure-line faculty and tenure and promotion committees. These committees are essential responsibilities and privileges for tenured faculty, playing a critical role

in shaping the intellectual diversity of their departments and the college. By denying Dr. Valente these opportunities, the University has not only impeded his professional engagement and academic freedoms but also marginalized his influence in key institutional decisions.

114.    Penn State's conduct demonstrates an institutional pattern of undermining Dr. Valente's professional standing and academic authority in order to isolate and silence him as he attempts to be transparent about systemic barriers for employees with disabilities and contending with discrimination and retaliation.

115.    The University's discriminatory actions continue to create cumulative and compounding harm to Dr. Valente's professional development and career trajectory

## CLAIM I: VIOLATIONS OF TITLE I OF THE AMERICANS WITH DISABILITIES ACT

116.    Plaintiff repeats and re-alleges all preceding paragraphs in support of this claim.

117.    At all times relevant to this action, Title I of the ADA, 42 U.S.C. §§ 12111, et seq. has been in full force and effect and has applied to Defendants' conduct.

118.    At all times relevant to this action, Plaintiff has been substantially limited in the major life activity of hearing. Accordingly, he is an individual with a disability within the meaning of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2).

119.    At all relevant times, Plaintiff was and remains a qualified individual with a disability who could perform the essential functions of his position with reasonable accommodation.

120.    Penn State discriminated against Plaintiff on the basis of his disability by unilaterally revoking his previously approved accommodations, implementing a discriminatory accommodation framework, failing to engage in the interactive process, creating artificial barriers to professional advancement, imposing undue administrative burdens, limiting access to essential

academic activities, requiring use of inadequate alternative accommodations, and creating disparate working conditions compared to non-disabled faculty.

121.    Defendant is a covered entity and an employer within the meaning of Title I of the ADA, 42 U.S.C. §§ 12111(2) and 12111(5), respectively.

122.    Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

123.    Title I of the ADA defines discrimination to include "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee." 42 U.S.C. § 12112(b)(1).

124.    Title I of the ADA further defines discrimination to include utilizing standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability, or that perpetuate the discrimination of others who are subject to common administrative control. 42 U.S.C. § 12112(b)(3).

125.    Title I of the ADA further defines discrimination to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

126.    Title I of the ADA further defines discrimination to include "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a

disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B).

127.   Defendant discriminated against Plaintiff, on the basis of his disability, in violation of Title I of the ADA and its implementing regulations, such as Defendants discriminated against Plaintiff on the basis of his disability by discriminating against him in regard to the terms, conditions, and privileges of employment in violation of 42 U.S.C. § 12112(a); limiting him in a way that adversely affects his opportunities and status in violation of 42 U.S.C. § 12112(b)(1); using standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability in violation of 42 U.S.C. § 12112(b)(3); failing to make reasonable accommodations in violation of 42 U.S.C. § 12112(b)(5)(A); denying employment opportunities based on the need to make such accommodations in violation of 42 U.S.C. § 12112(b)(5)(B); using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability in violation of 42 U.S.C. § 12112(b)(6);

128.   Penn State's discriminatory conduct has caused Plaintiff to suffer substantial damages, including but not limited to lost professional opportunities, diminished teaching and research capabilities, reputational harm, and emotional distress

129.   On information and belief, discrimination against Dr. Valente is the result of a policy and/or practice of Defendant to limit, restrict, or segregate Dr. Valente based on his disability.

130.   As a result of the alleged conduct, Defendant has demonstrated deliberate indifference, malice, and reckless disregard for Dr. Valente's federally protected rights

131.   As set out above, absent injunctive relief there is a clear risk that Defendant's

actions will recur with Plaintiff and/or additional deaf employees.

132.    Plaintiff is therefore entitled to compensatory and punitive damages, injunctive relief, and an award of attorney's fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12117(a).

## CLAIM II: RETALIATION IN VIOLATION OF TITLE V OF THE AMERICANS WITH DISABILITIES ACT

133.    Plaintiff repeats and re-alleges the preceding paragraphs.

134.    At all relevant times, Plaintiff was and remains a qualified individual with a disability who could perform the essential functions of his position with reasonable accommodation.

135.    Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations for his disability, opposing discriminatory practices, and filing internal and external complaints of discrimination.

136.    Penn State retaliated against Plaintiff for engaging in protected activity by orchestrating the coordinated departure of his advisees, canceling his graduate courses without justification, soliciting anonymous complaints, subjecting him to unprecedented scrutiny, interfering with his research protocols, implementing discriminatory meeting procedures, and creating a hostile work environment.

137.    The temporal proximity between Plaintiff's protected activities and Penn State's adverse actions demonstrates retaliatory intent.

138.    Penn State's retaliatory conduct has caused Plaintiff to suffer substantial damages, including but not limited to emotional distress, professional isolation, reputational harm, and loss of career opportunities

## CLAIM III: DISCRIMINATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 794)

139.    Plaintiff repeats and re-alleges the preceding paragraphs

140.    Penn State receives federal financial assistance and is therefore subject to Section 504 of the Rehabilitation Act.

141.    At all relevant times, Plaintiff was and remains a qualified individual with a disability who could perform the essential functions of his position with reasonable accommodation.

142.    Penn State discriminated against Plaintiff solely by reason of his disability by failing to maintain effective accommodations, creating barriers to full participation in academic life, imposing discriminatory policies and practices, failing to provide equal access to professional opportunities, and maintaining discriminatory institutional practices.

143.    Penn State's discriminatory conduct under Section 504 was undertaken with deliberate indifference to Plaintiff's federally protected rights.

144.    As a direct and proximate result of Penn State's unlawful conduct, Plaintiff has suffered and continues to suffer substantial damages.

## CLAIM IV: RETALIATION IN VIOLATION OF SECTION 504 OF THE REHABILITATION ACT  (29 U.S.C. § 794)

145.    Plaintiff repeats and realleges the preceding paragraphs.

146.    At all relevant times, Plaintiff was and remains a qualified individual with a disability who could perform the essential functions of his position with reasonable accommodation.

147.    Plaintiff engaged in protected activity under Section 504 by requesting accommodations for his disability, opposing discrimination, and filing administrative complaints.

148.     Penn State retaliated against Plaintiff by engaging in adverse actions designed to isolate him within the academic community and impede his professional advancement.

149.     Penn State's retaliatory conduct has caused Plaintiff to suffer substantial damages, including financial losses, emotional harm, and loss of professional opportunities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Joseph Michael Valente respectfully requests that this Court:

148.     Enter judgment in his favor and against Defendant on all counts;

149.     Issue a declaratory judgment that Defendant's conduct violated the ADA and Section 504 of the Rehabilitation Act;

150.     Issue permanent injunctive relief:

A.     Requiring Defendant to restore Plaintiff's previously effective accommodation of two full-time qualified ASL interpreters;

B.     Requiring Defendant to establish a centralized accommodation funding system;

C.     Requiring Defendant to implement comprehensive disability training programs;

D.     Requiring Defendant to create oversight mechanisms for accommodation decisions;

E.     Requiring Defendant to develop clear procedures for the interactive process;

F.     Requiring Defendant to establish anti-retaliation monitoring systems;

151.     Award compensatory damages for all losses caused by Defendant's unlawful conduct;

152.    Award punitive damages under Title I of the ADA;

153.    Award Nominal Damages

154.    Award reasonable attorneys' fees, costs, and expenses;

155.    Award pre- and post-judgment interest; and

156.    Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 14, 2025

<div style="margin-left:40%">

Respectfully submitted,
By:

Andrew Rozynski, Esq. (NY 5054465)
arozynski@eandblaw.com
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
*Attorneys for Plaintiff*

*/s/ Mary Vargas*
Mary Vargas (PA 324005)
Stein & Vargas, LLP
1717 K Street NW, Suite 900
Washington, DC 20006
240-793-3185 (tel.)
888-778-4620 (fax)
*Local Counsel for Plaintiff*

</div>