UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DR. JOSEPH MICHAEL VALENTE, | CIVIL NO. 4:25-CV-00277 |
| Plaintiff, | (NEARY, J.) (LATELLA, M.J.) |
| v. | |
| THE PENNSYLVANIA STATE UNIVERSITY, et al., | |
| Defendants. | |

## MEMORANDUM

Plaintiff, a deaf tenured professor at the Pennsylvania State University ("PSU") alleges that Defendants improperly revoked previously agreed to accommodations and then retaliated against him when he attempted to have those accommodations reinstated. The alleged retaliation culminated in the Office of Ethics and Compliance issuing a nearly 200-page report addressing various complaints lodged against Plaintiff as well as complaints raised by Plaintiff (the "OEC Report"). Plaintiff's request for the OEC Report through discovery provoked a dispute ultimately resulting in Defendants filing a Motion for a Protective Order. While Defendants request that eight categories

1

of documents be kept confidential – it is clear based upon both parties' briefing – that the crux of the dispute relates to the OEC Report.   For the reasons set forth herein, Defendants' Motion for a Protective Order will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff initiated this action on February 14, 2025 against Defendant PSU.  (Doc. 1).  PSU filed an Answer on April 15, 2025. (Doc. 7).  On July 14, 2025, Plaintiff filed a letter to the docket requesting a telephonic discovery conference to resolve a discovery dispute regarding Defendant's production of the Final Investigative Report from the Office of Ethics and Compliance (the "OEC Report"). (Doc. 20).  Chief Magistrate Judge Daryl Bloom referred the discovery dispute to the undersigned federal magistrate judge.  PSU submitted a letter in opposition to Plaintiff's submission on July 18, 2022 (Doc. 23) and Plaintiff submitted a reply thereto on July 21, 2025 (Doc. 25).  We held a telephonic discovery conference on July 22, 2025.  (Doc. 22).

Plaintiff filed an Amended Complaint on July 18, 2025.  (Doc. 24). He added an additional defendant, Dr. Kimberly Lawless, Dean of the College of Education at PSU.  *Id.*  In the Amended Complaint, Plaintiff

2

alleges that Defendants revoked certain disability-related accommodations due to budgetary constraints. (*Id.* at ¶ 24). When Plaintiff made efforts to restore those accommodations, he alleges that Defendants engaged in retaliation. (*Id.* at ¶ 25). The Amended Complaint includes six counts. He asserts a violation of the Americans with Disabilities Act; retaliation in violation of the Americans with Disabilities Act; a violation of Section 504 of the Rehabilitation Act; retaliation in violation of the Rehabilitation Act; violation of the Fourteenth Amendment; and violation of the First Amendment. *Id.* Defendants filed an Answer to Plaintiff's Amended Complaint on August 15, 2025. (Doc. 30).

On August 15, 2025, Defendants also submitted a letter to the Court in support of a motion for a protective order. (Doc. 31). Plaintiff submitted a response on August 17, 2025. (Doc. 32). On August 22, 2025, we held an additional telephonic conference in an effort to resolve the ongoing discovery dispute. (Doc. 35). The parties were not able to resolve their dispute and so, Defendants were directed to file a motion for a protective order. *Id.* Defendants filed their motion and supporting brief on September 5, 2025. (Docs. 36, 37). Plaintiff filed a brief in

opposition on September 19, 2025.  (Doc. 38).  Defendants filed a reply in further support on October 3, 2025.  (Doc. 39).

The matter is now ripe for review.

## II.    LEGAL STANDARD[1]

Issues relating to the scope of discovery permitted under Rule 26 rest in the sound discretion of the Court.  *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 90 (3d Cir. 1987).  Under Federal Rule of Civil Procedure 26(c), the Court may, for good cause, issue a protective order "to shield a party from annoyance, embarrassment, oppression, or undue burden or expense" during discovery.  Fed. R. Civ. P. 26(c)(1); *see also Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994).  "A protective order is intended to offer litigants a measure of privacy, while balancing against this privacy interest the public's right to obtain information concerning judicial proceedings."  *In re Avandia Mktg. Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 671 (3d Cir. 2019) (quotation marks omitted); *see also McKenna v. City of Philadelphia,*

---

[1] Discovery disputes are considered non-dispositive matters which may be addressed by federal magistrate judges.  *See* 28 U.S.C. §636(b)(1)(A); Fed. R. Civ. P. 72(a); *see also Riley v. Clark*, No. 4:20-CV-325, 2023 WL 6129507, at *2 (M.D. Pa. Sept. 19, 2023).

No. Civ.A. 98-5835, 2000 WL1521604, at \*1 (E.D. Pa. Sept. 29, 2000) ("Whether th[e] disclosure will be limited depends on a judicial balancing of the harm to the party seeking protection (or third persons) and the importance of disclosure to the public."). The "party seeking a protective order over discovery material must demonstrate that good cause exists for the order." *In re Avandia*, 924 F.3d at 671. "Good cause means that disclosure will work a clearly defined and serious injury to the party seeking closure," and the injury "must be shown with specificity." *Id.* "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning do not support a good cause showing." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994).

In determining whether good cause exists, the Third Circuit has instructed us to consider the following factors, which are "neither mandatory nor exhaustive": (1) whether the disclosure will violate any private interests; (2) whether disclosure of the information will cause a party embarrassment; (3) whether the information is being sought for a legitimate purpose or for an improper purpose; (4) whether the sharing of information among the litigants will promote fairness and efficiency;

(5) whether confidentiality is being sought over information important to public health and safety; (6) whether a party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public. *Glenmeade Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) (citing *Pansy*, 23 F.3d at 787-91)).  These have come to be known as the *Pansy* factors.

Courts have the discretion to "fashion a set of limitations that allows as much relevant material to be discovered as possible, while preventing unnecessary intrusions into the legitimate interests— including privacy and other confidentiality interests—that might be harmed by the release of the material sought." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).  Applying the *Pansy* factors here, we find that they weigh in favor of granting the protective order.

## III.  DISCUSSION

Defendants indicate that they are prepared to produce relevant documents responsive to Plaintiff's request. (Doc. 37 at 13)[2].  However, they submit that eight categories of documents should be protected and

---

[2] For the sake of clarity, to the extent there is a discrepancy between a party's pagination in briefing and the ECF page number, we refer, in all instances, to the ECF page number.

that the use of documents in these categories outside of this lawsuit should be prohibited.  (*Id.*).  The eight categories of documents that Defendant seek to protect include: (1) statutorily protected information; (2) Plaintiff's medical records; (3) the OEC Report; (4) documents related to the OEC Report; (5) personnel files and related documents pertaining to faculty and Penn State staff who are not Plaintiff; (6) complaints raised about Plaintiff by students, faculty, and staff; (7) any documents pertaining to current or former students; and (8) electronic communications among Penn State students, faculty, or staff (excluding communications that included Plaintiff), due to confidentiality protections afforded to those communications under Penn State Policy AD53.  We will consider those requests in light of the *Pansy* factors.

    A.    <u>First *Pansy* Factor: Will Disclosure Violate Privacy Interests</u>

In many cases, courts have considered this first factor the most important when analyzing a motion for a protective order.  *See, e.g.*, *Humphries v. Barber*, No. 4:20-cv-00064, 2022 WL 3107914, at \*3 (M.D. Pa. Aug. 4, 2022); *Rosenblit v. City of Philadelphia*, No. CV 20-3121-KSM, 2021 WL 288887, at \*6 (E.D. Pa. Jan. 28, 2021); *McCowan v. City of Philadelphia*, No. 2:19-cv-03326-KSM, 2021 WL 1193241 at \*4 (E.D.

Pa. Mar. 30, 2021). We consider the privacy interests implicated with respect to each of the categories of documents Defendants seek protection over.

### 1. Category 1: Statutorily Protected Information

Defendants do not provide much detail regarding the types of documents included within this category. The only referenced statute is the Family Educational Rights and Privacy Act of 1974 ("FERPA"). (Doc. 37 at 10-11). Accordingly, we will only address the applicability of FERPA. Defendants maintain that FERPA applies to the OEC Report and the investigation-related documents, both separate categories of documents for which Defendants seek protection. (*Id.* at 15). In support of this argument, Defendants point to *Humphries v. Barber*, No. 4:20-cv-00064, 2022 WL 3107914, at *3 (M.D. Pa. Aug. 4, 2022) and *Manco v. St. Joseph's University*, 350 F.R.D. 62 (E.D. Pa. 2025).

Plaintiff's discussion of this section is similarly sparse. Initially, Plaintiff notes that Defendants' motion for protection of this category of documents "fails because Penn State has not identified which statutes allegedly protect what specific information." (Doc. 38 at 13). However, in apparent recognition of the fact that Defendants do raise FERPA and

tie it to the OEC Report, Plaintiff then argues that FERPA has no

application here because the OEC Report is redacted and so, "the

privacy interests FERPA seeks to protect have already been addressed."

(*Id.* at 15).  Further, Plaintiff argues that the OEC Report is an

employment record concerning faculty misconduct, and not an

education record, therefore falling outside the ambit of FERPA's

purview.  (*Id.*).  In support of that proposition, Plaintiff cites to *Rios v.*

*Read*, 73 F.R.D. 589, 598 (E.D.N.Y. 1977).[3]

FERPA applies to all educational institutions or agencies that

receive funds under federal programs administered by the U.S.

Commissioner of Education.  *Lei Ke v. Drexel Univ.*, No. CIV.A. 11-6708,

2014 WL 1100179, at *4 (E.D. Pa. Mar. 20, 2014).  FERPA establishes

minimum standards for the protection of a student's privacy and other

rights, and enforces such standards by authorizing the denial of funds

to educational institutions and agencies that fail to meet these

prerequisites.  20 U.S.C. § 1232g.  Section 1232g(b)(1) prevents the

unrestricted release of a student's education records or any "personally

---

[3] This case does not stand for the specific proposition asserted by Plaintiff.  None of the documents sought in *Rios* pertained to employee records.  73 F.R.D. at 591-92.

identifiable information" contained in such records to unauthorized individuals or organizations without the consent of the student and/or parents. *See Mattie T. v. Johnson,* 74 F.R.D. 498, 501 (N.D. Miss. 1976). Education records are those records or documents maintained by the institution or agency which "contain information directly related to a student." 20 U.S.C. § 1232g(a)(4)(A)(i).

"Personally identifiable information" is defined in 34 C.F.R. § 99.3 to include: (a) the student's name; (b) the name of the student's parent or other family member; (c) the address of the student or student's family; (d) a personal identifier, such as the student's social security number, student number, or biometric record; (e) other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name; (f) other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty; or (g) information requested by a person who the educational agency or institution reasonably believes

knows the identity of the student to whom the education record relates. 34 C.F.R. § 99.3.

While we find the opinions in *Humphries* and *Manco* instructive as to whether certain other categories of documents warrant protection, we are unable to find, based upon those opinions, that the entire OEC Report and associated documents are protected by FERPA. In *Manco,* the parties entered into a protective order that included an investigation report based upon student complaints of a professor that included redactions made pursuant to FERPA. 350 F.R.D. at 66. The parties did not raise the issue of whether FERPA applies to records relating to teachers or employees rather than students and so, the court did not reach that issue. In *Humphries*, the investigative report at issue dealt with allegations of a student, not professor misconduct. 2022 WL 3107914. Accordingly, the analysis in that opinion regarding the applicability of FERPA is likewise not directly applicable here.

Other courts that have considered similar facts have held that "FERPA protects the disclosure of student records, not teacher records." *J.O. v. Board of Education of Albuquerque Public School*, No. 1:23-cv-01021-KG-JMR, 2025 WL 623543, at *2 (D.N.M. Feb. 26, 2025) (citing

11

*Klein Indep. Sch. Dist. v. Mattox*, 830 F.2d 576, 579 (5th Cir. 1987)).

Accordingly, courts have found that reports of student misconduct are

protected by FERPA[4], *U.S. v. Miami University*, 294 F.3d 797, 815 (6th

Cir. 2002), but reports relating to investigations of employee complaints

of discrimination are not "educational records" protected from disclosure

by FERPA, *Seoane-Vazquez v. Ohio State University*, No. 02:07-CV-

00775, 2009 WL 10710390, (S.D. Ohio May 8, 2009), and likewise,

reports of employee misconduct do not constitute "educational records,"

*Ellis v. Cleveland Municipal School Dist.*, 309 F. Supp. 2d 1019, 1022

(N.D. Ohio 2004).

The fact that student information sometimes appears in employee

records does not necessarily transform those documents into "education

records" protected by FERPA. *Id.* In *Seoane-Vazquez v. Ohio State*

*University*, No. 02:07-CV-00775, 2009 WL 10710390, (S.D. Ohio May 8,

2009), the court considered whether records relating to an investigation

of a professor's complaint that other faculty members discriminated

against him because of his national origin, including summaries of two

---

[4] The report in *Humphries* related to allegations of student misconduct, putting it squarely within FERPA. *See Miami*, 294 F.3d at 815.

student interviews, was protected by FERPA.  The court noted that the records at issue included student statements to university investigators regarding employee conduct, including interactions with students.  *Id.* at \*4.  The court concluded that "documents created during the course of the investigation of . . . [the] discrimination complaint and those used during the course of the [school's] decision to deny him tenure are not 'educational records' within the meaning of FERPA except to the extent that they may incorporate 'educational records. . .'"  *Id.* at \*1.

In *Ellis v. Cleveland Municipal School Dist.*, 309 F. Supp. 2d 1019 (N.D. Ohio 2004), the court considered a discovery dispute arising from a student's suit against the school district regarding corporal punishment of students by substitute teachers.  *Id.*  The plaintiff sought records of allegations of physical altercations involving substitute teachers, as well as student and employee witness statements related to those altercations.  *Id.* at 1022.  The court held that these did not qualify as educational records because "[w]hile these records clearly involve students as alleged victims and witnesses, the records themselves are directly related to the activities and behaviors of the teachers themselves and are therefore not governed by FERPA."  *Id.* at

13

1023.  The court noted that "Congress did not intend FERPA to cover records directly related to teachers and only tangentially related to students." *Id.* at 1022 (citing *Bauer v. Kincaid*, 759 F. Supp. 575, 591 (W.D. Mo. 1991) (FERPA was designed to address systematic violations of student privacy and function of FERPA is "to protect educationally related information")).

Likewise, in *J.O. v. Bd. of Educ. Of Albuquerque Public Schools*, No. 1:23-cv-01021-KG-JMR, 2025 WL 623543, at *2 (D.N.M. Feb. 26, 2025), the court found that an administrative investigation into an employee's misconduct was not an education record covered by FERPA. The court noted that student victim and witness statements contained therein related to the activities and behaviors of the teacher.  *Id.* at *3. While the court found certain specific documents in the report were education records protected by FERPA, it concluded that "the bulk of the records are an investigation report into a teacher . . . rather than 'education records' related to a particular student."  *Id.*

Here, too, the "bulk" of the OEC Report relates to the investigation report of a professor, not education records of a particular student.  Without disclosing specific details of the OEC Report, it covers

both complaints raised by students and other faculty and staff members about Plaintiff as well as complaints made by Plaintiff against PSU. Those portions of the OEC Report that focus on Plaintiff's allegations against PSU are not subject to FERPA.  *See Seoane-Vazquez*, 2009 WL 10710390, at *1.

The portions of the OEC Report discussing complaints against Plaintiff, however, require a more nuanced consideration.  We note that certain reports made by students or accounts of specific student incidents relayed by other University personnel include detailed information relating to specific students' educational experiences. Unlike the student statements in *Ellis* that related to allegations of teachers' corporal punishment or the student statements in *Seoane-Vazquez* which related to an employee's allegations of discrimination by other employees[5], many of the accounts provided by students, faculty and staff relate to specific student incidents involving education.  *See Ellis*, 309 F. Supp. 2d at 1021; *Seoane-Vazquez,* 2009 WL 10710390, at

---

[5] The OEC Report also discussed Plaintiff's complaints that the University failed to afford him with his requested accommodations and retaliated against him.  As noted above, the portions of the OEC Report relating only to those issues are not covered by FERPA.

*1.  Given the "broad" definition of "education records," set forth in FERPA, we deem documents within the OEC Report that include such information to be "education records."  *See Miami Univ.*, 294 F.3d at 812.  We do not consider documents relating to complaints against Plaintiff that include only general allegations to be "education records," but rather only those documents that include allegations or instances with sufficient specificity that the student involved may potentially be identifiable.  *See* 34 C.F.R. § 99.3 (personally identifiable information under FERPA includes "other information that, along or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty.").  To that end, merely redacting the names of complainants or witnesses would be insufficient.  Based upon the very specific accounts and details provided, it is possible that the identities of those individuals may still be ascertained notwithstanding the redactions.  The pages of the OEC Report covered by FERPA include: 7, 8, 9, 10, 11, 12, 15, 16, 20, 21, 23, 24, 30, 31, 33, 34, 35, 36, 37, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75,

76, 77, 78, 80, 83, 84, 85, 86, 87, 90, 93, 97, 98, 99, 100, 110, 113, 114, 115, 152, 153, 154, 155, 156, 157, 166, 167, 168, 169, 170.

Materials covered by FERPA do not gain immediate protection but are presumed to have a strong privacy interest attached. *Manco*, 350 F.R.D. at 69 (citing *Lei Ke*, 2014 WL 1100179, at *5). Thus, as the court found in *Manco*, "disclosure of FERPA-protected information violates the privacy interests of current and former students named in the [OEC Report]" and so, "[t]his factor deserves special weight in the analysis, since the privacy interests at issue are afforded explicit protection under federal law." *Manco*, 350 F.R.D. at 69.

### 2.  Category 2: Plaintiff's Medical Records

Unfortunately, neither party provides any analysis of what medical records of Plaintiff the Defendants seek to keep confidential. Because Plaintiff does not include any objection to this category of records, we consider Defendants' request for protection over this category of documents to be unopposed. *See, e.g.*, *Advanced Fluid Systems, Inc. v. Huber*, 381 F. Supp. 3d 362, 392 n.15 (M.D. Pa. 2019) (courts have discretion to deem opposition to an argument to be waived where a party fails to respond to the argument in an opposition brief).

17

3. Categories 3 and 4: The OEC Report and Related
   Documents

Defendants assert that "other courts in the Third Circuit have

recognized the privacy interests implicated by internal investigations,

non-party personnel records, and non-party complaints outside the

university context."  (Doc. 37 at 15) (citing *McKenna*, 2000 WL 1521604,

at *3; *Rosenblit*, 2021 WL 288887, at *6, 8).  Defendants argue that the

non-party students and faculty involved in the report have legitimate

privacy interests that "should not be jeopardized by giving Plaintiff

carte blanche to disclose them outside of this litigation."  (Doc. 37 at 16).

Plaintiff counters that privacy interests are "minimal" and have

been adequately addressed by redactions.  (Doc. 38 at 17-18).  He also

argues that the "sword-and-shield doctrine" prohibits Defendants from

"wield[ing] evidence as a weapon while shielding it from scrutiny."  (*Id.*

at 11).  He asserts that Defendants publicly announced the report's

conclusions of misconduct in their Answer and so, cannot shield the

report from scrutiny.  (*Id.* at 14).

Defendants reply by arguing that redactions are not sufficient to

protect the privacy interests at stake.  (Doc. 39 at 6).  They also

maintain that the "sword-and-shield" doctrine has no application here.

18

(*Id.* at 17). Defendants argue that Plaintiff's reliance upon *EEOC v. George Washington University*, 502 F. Supp. 3d 62, 71 (D.D.C. 2020) is misplaced because that case addressed whether the attorney-client privilege can be waived by placing the contents of a document at issue and Defendants here are not invoking attorney-client privilege. Further, Defendants point out that they are not seeking to "shield" relevant documents "from the parties, the Court, or other individuals who have a *bona fide* interest in Plaintiff's lawsuit." (Doc. 39 at 18). Rather, Defendants argue that they are attempting to "facilitate the exchange of information necessary to advance discovery, while also guarding documents containing sensitive, personal, and potentially injurious information belonging to Penn State faculty, staff, and students against broad dissemination to the public." (*Id.*).

We find unpersuasive Plaintiff's contention that any privacy interests of students or faculty in the statements that they provided in conjunction with PSU's investigation of Plaintiff are "minimal." (*See* Doc. 38 at 17-18). Rather, as other courts have recognized, non-party student and faculty witnesses and complainants have a privacy interest in keeping their reports confidential. *Manco*, 350 F.R.D. at 67-68;

19

*Rosenblit*, 2021 WL 2888887, at *6 (public disclosure of investigatory

file would threaten privacy interests of nonparties, where investigatory

file included complaints and witness interviews given with expectation

of privacy, discretion, and even confidentiality); *McKenna*, 2000 WL

1521604, at *2-3 (finding individuals who provided information

regarding EEOC complaints and investigations had interest in

maintaining confidentiality of the records, noting "[t]he candor of people

providing information in such investigations is essential to the

investigative process.  Disclosure could 'chill' such candor in the

future.")[6]  Preserving such confidentiality is a legitimate concern of

---

[6] Plaintiff's reliance upon *University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990) for the proposition that "Penn State's primary justification—that disclosure would 'chill' future investigations," is misplaced.  Plaintiff argues that the Supreme Court "unanimously rejected the argument that disclosing peer review materials would chill participation. (Doc. 38 at 16).  He claims that "Penn State makes the identical argument the Supreme Court rejected" and that "its witnesses were employees with obligations to cooperate, not volunteers." (*Id*.).  In *University of Pennsylvania*, the school sought to completely withhold subpoenaed documents from a professor's tenure file documents from the EEOC based upon assertions of privilege.  Here, as Defendants point out, they are not attempting to withhold any documents from Plaintiff based upon any assertions of privilege. (Doc. 39 at 13-14).  Rather, they claim that they have shared or are prepared to share, relevant information with Plaintiff in the course of discovery, but seek to prohibit certain records from *public* disclosure.  The Court's analysis in *University of Pennsylvania*, therefore, is inapposite.  Further, we note

PSU, as "a chilling effect could result from disclosure, which could negatively impact campus culture and its students' trust in the university." *Manco*, 350 F.R.D. at 67.

Further, we do not agree with Plaintiff that the "sword-and-shield" doctrine requires that Plaintiff be permitted to publicly disseminate the OEC Report and associated documents. Plaintiff cites a single case for this proposition: *United States Equal Employment Opportunity Commission v. George Washington University*, 502 F. Supp. 3d 62 (D.D.C. 2020). In that case, the Court considered whether a party placed privileged material at issue by "asserting reliance on an attorney's advice as an element of a claim or defense." 502 F. Supp. 3d at 87. The Court found no basis to conclude that the University would advance a defense that relies upon privileged materials so as to justify a waiver of attorney-client privilege. We find those facts far afield from the issue at hand. Here, as Plaintiff well knows, Defendants are not asserting a privilege as a basis to withhold the OEC or associated

Defendants seek to protect statements from both faculty and student non-party witnesses and complainants. Any suggestion by Plaintiff that those individuals' participation in PSU's investigation was mandatory is not supported by the submissions before us.

documents from Plaintiff for use in the current litigation. And nothing in this opinion should be construed as suggesting that—to the extent a document is deemed deserving of protection from public dissemination—Plaintiff is prohibited from utilizing it in the prosecution of his claims. We therefore reject Plaintiff's argument that the sword-and-shield doctrine is a basis to deny Defendants' Motion for a Protective Order.

Finally, as discussed *supra*, we do not deem redactions of names sufficient to protect the identities of non-party student, faculty, and staff complainants and witnesses given the detailed accounts provided. Thus, for the reasons stated above, the first *Pansy* factor weighs heavily in favor of a protective order as to those portions of the OEC Report that are not yet in the public domain.

However, as Defendants provide in their Proposed Protective Order, "[n]o information that is in the public domain; that is already known by the receiving Party through proper means; or that becomes available to a Party from a source other than the Party asserting confidentiality and such source was rightfully in possession of such information on a non-confidential basis, will be deemed to be

22

Confidential Material under this Order." (*See* Doc. 36-4 at ¶ 4). Several

documents reproduced within the OEC Report fall into that category.

Accordingly, there is no privacy interests in the following portions of the

OEC Report:

1. Appendix A: August 14, 2023, Letter from Eisenberg & Baum regarding Dr. Valente; Page 82
2. Appendix F: December 20, 2024, Memorandum from Dean Kimberly Lawless to Dr. Valente; Pages 101-102
3. Appendix G: January 6, 2025, Email from Dr. Valente to Dean Kimberly Lawless; Pages 103-108
4. Appendix K: February 14, 2025, Dr. Valente's Complaint in this matter; Pages 118-144
5. Appendix M: March 26, 2025, Email from Dr. Valente to Erik Kochanowski; Pages 148-149
6. Appendix N: December 20, 2013, Letter from Affirmative Action and Diversity Education Office to Dr. Valente; Pages 150-151
7. Appendix Q: December 20, 2024, Letter from Dean Lawless to Dr. Valente; Pages 158-159
8. Appendix R: January 6, 2025, Dr. Valente email to Dean Lawless; Pages 160-165

4. <u>Category 5: Personnel Files and Related Documents for Faculty and Staff Other than Valente</u>

Defendants maintain the first *Pansy* factor also weighs in favor of

protection for described personnel files. (Doc. 37 at 15-16). Defendants

cite to *McKenna* and *Rosenblit*, asserting that non-party faculty "whose

records may be drawn into this matter" have legitimate privacy

23

interests that "should not be jeopardized by giving Plaintiff carte blanche to disclose them outside of this litigation." (*Id.* at 16).

Plaintiff includes only a brief argument with respect to the personnel files. (Doc. 38 at 14). With no citation to any legal authority, he claims that: "[]personnel file[] may contain comparator evidence essential to proving discrimination. Where such evidence is relevant and necessary to establish unlawful discrimination, the public interest in exposing discriminatory practices outweighs generalized privacy concerns." (*Id.*).

Courts regularly acknowledge the confidential nature of non-party personnel files. *Miles v. Boeing Co.*, 154 F.R.D. 112, 115 (E.D. Pa. 1994) ("Personnel files are confidential and discovery should be limited."); *McKenna*, 2000 WL 1521604, at *2 ("The interests of the [p]laintiffs with regard to" personnel files "cannot overcome the privacy and safety interests that the [d]efendants and the public have in their confidentiality."); *Northern v. City of Philadelphia*, No. CIV. A. 98-6517, 2000 WL 355526, at *3 (E.D. Pa. Apr. 4, 2000) (discovery of personnel files should be limited). Although employment information regarding other candidates or employees in an employment discrimination case is

24

subject to discovery, *University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182 (1990), personnel files are confidential and discovery should be limited. *Miles*, 154 F.R.D. at 115 (citing *Orbovich v. Macalester College,* 119 F.R.D. 411, 415 (D. Minn. 1988)).

Here, non-party PSU faculty plainly have a privacy interest in maintaining the confidentiality of their personnel files. As the court in *Rosenblit* acknowledged, those individuals "have no opportunity to defend themselves or provide context for their records" and so, public dissemination of the files "would open those employees to potential censure and embarrassment." 2021 WL 288887, at *6. Accordingly, the first *Pansy* factor weighs in favor of protection of the personnel files.

> 5. Category 6: Complaints Raised About Plaintiff by Students, Faculty, and Staff

Defendants shed no light as to the particulars of this category of documents. It is unclear whether PSU includes additional complaints about Plaintiff by student, faculty, and staff, which were not captured in the OEC Report, or would not be considered documents related to the OEC Report. Likewise, Plaintiff gives only cursory treatment to this category, noting that it "presents particularly troubling grounds for blanket protection. Given Plaintiff's allegation that complaints were

solicited as part of a retaliatory scheme, categorical protection would shield evidence of the retaliation itself." (Doc. 38 at 14).

Given the parties' lack of attention to this category, we will simply apply our analysis as to the OEC Report and Related Documents to this category as well. We note, however, again, that Plaintiff's suggestion that "protection" of this category of documents will "shield evidence of the retaliation" mischaracterizes the relief sought by Defendants. As Defendants stated multiple times in their briefing, and we have already discussed herein, Defendants indicated that they have or will produce relevant documents to Plaintiff for use in this litigation. Thus, there will be no shielding of relevant evidence by virtue of granting Defendants' Motion for a Protective Order.

6. <u>Category 7: Any Documents Pertaining to Current or Former Students</u>

Defendants likewise fail to expound upon the particulars of this category of documents. And Plaintiff offers no response as to this category of documents. It is not possible for us to evaluate the privacy interests at stake based upon the information provided.

7.    Category 8: Electronic Communications Among Penn State Students, Faculty, or Staff (PSU Policy AD53)

Finally, Defendants argue that PSU faculty, staff, and students have a reasonable expectation of privacy in their emailed communications pursuant to University Policy AD53.  (Doc. 37).

Plaintiff counters – again with no citation to legal authority – that university policies "cannot create federal evidentiary privileges or supersede Rule 26 analysis."  (Doc. 38 at 14).  Further, he claims that "employees discussing or performing workplace misconduct have no reasonable expectation that their communications will remain secret if litigation ensues."  (*Id.*).

In *Hodczak v. Latrobe Specialty Steel Company*, No. 08-649, 2009 WL 10689802, at \*2 (W.D. Pa. Nov. 2, 2009), the Court found that no privacy rights would be violated by disclosure of employee emails where the employees had no expectation of privacy in their emails pursuant to the employer's electronic communications policy.

Unlike in *Hodczak*, PSU maintains a policy which recognizes an expectation of privacy for employees and students in their communications, including electronic communications.  (Doc. 37 at 16-17).  PSU Policy AD53 provides that:

27

> [T]he University recognizes the reasonable
> privacy expectations of its students [and]
> employees . . . in relation to their personal
> information, including papers, confidential
> records, and communications by mail, telephone,
> and other electronic means, subject only to
> applicable state and federal laws and University
> policies and regulations . . . . Except as required
> in the ordinary course of University business, the
> University will not access or monitor such
> information without cause except as required by
> law or otherwise permitted by University
> Policy . . . .

(*Id.* at 17). Based upon this policy, it appears as though PSU faculty, staff, and students have a reasonable expectation of privacy in their electronic communications. Accordingly, the first *Pansy* factor weighs in favor of protection, as disclosure would violate the privacy interests of those faculty, staff, and students.

B.    Second *Pansy* Factor: Whether Disclosure of the Information Will Cause a Party Embarrassment

Defendants argue that unrestricted disclosure of student and faculty statements, communications, and files "will certainly result in the embarrassment of non-parties." (Doc. 37 at 20). Because we believe the categories overlap, for purposes of consideration of the some of the remaining *Pansy* factors, we will combine the following categories: Category 1: statutorily protected information; Categories 3 and 4: the

28

OEC Report and Associated Documents; and Category 6: complaints raised about Plaintiff by students, faculty and staff.

1. Categories 1, 3, 4, 6: Statutorily Protected Information, the OEC Report and Associated Documents, Complaints raised about Plaintiff

These categories of documents include "potentially embarrassing information about parties and non-parties alike." *See Humphries*, 2022 WL 3107914, at \*4. Our *in camera* review of the OEC Report reveals that students, faculty, and staff relayed specific, sensitive experiences and that disclosure of that information may result in embarrassment to the individuals who relayed such information. Accordingly, the second *Pansy* factor weighs in favor of protecting these categories of documents.

2. Category 5: Personnel Files of PSU Employees other than Valente

As courts have found, public disclosure of non-party personnel files would potentially cause embarrassment to those individuals. *See Rosenblit*, 2021 WL 288887, at \*6; *Morrison v. Philadelphia Housing Authority*, 203 F.R.D. 195, 197 (E.D. Pa. 2001). Thus, for this category, the second *Pansy* factor likewise weighs in favor of protection.

   3.  Category 7: Any Documents Pertaining to Current or
       Former Students

This category of documents is broad and undefined in scope.  Of

course, there is the potential that such a large category of documents

may contain some embarrassing information about current and former

students, but we cannot say for certain, given the limited information

we have been provided.  To the extent documents pertain to current or

former students and constitute "education records," however, they

would be covered by FERPA.

   4.  Category 8: Electronic Communications Among PSU
       Students, Faculty, or Staff

With respect to this category, in discussion of the second *Pansy*

factor, Defendants state that unrestricted disclosure of student and

faulty communications, including communications among faculty and

students relating to the OEC investigation, "will certainly result in the

embarrassment of non-parties, for which courts have shown particular

concern."  (Doc. 37 at 20).

   Plaintiff does not discuss the application of the second *Pansy*

factor with respect to each category of documents at issue.  Rather, he

cites to *In re Avandia*, noting "concern about a company's public image,

embarrassment, or reputational injury, without more, is insufficient."

(Doc. 38 at 19) (citing *In re Avandia*, 924 F.3d at 676).  We find this argument unhelpful and unpersuasive.  First, as Defendants noted, the parties potentially subject to embarrassment here included not only PSU, but more importantly, non-party students, faculty and staff.  Second, the language from *In re Avandia* cited by Plaintiff came from the Court's discussion of the "common law right of access," not an analysis regarding the propriety of a protective order under Rule 26.[7]  Here, we are not addressing the common law right of access; potential embarrassment resulting from disclosure is one of the factors we are to consider pursuant to our resolution of a motion for a protective order.

We are persuaded by Defendants that disclosure of electronic communications of students, faculty and staff, made with an expectation that those communications would be kept confidential, may cause embarrassment to non-parties.  Accordingly, this *Pansy* factor weighs in favor of protection as to this category of documents.

---

[7] In fact, the Third Circuit held that the court erred in conflating the legal standards for common law right of access and protective orders under Rule 26, noting that each has a distinct legal standard.  *In re Avandia*, 924 F.3d at 669.

C.   Third *Pansy* Factor: Whether the Information is Being Sought for a Legitimate Purpose or for an Improper Purpose

Neither party separates this factor out with respect to the various categories of documents for which Defendants are seeking a protective order.  Our analysis of this factor will therefore also pertain to all categories.

Defendants argue that Plaintiff "[h]as [s]ignaled" that the requested materials are being sought for an improper purpose: to clear his name publicly.  (Doc. 37 at 17-18).  Defendants further note that Plaintiff has made repeated references to media interest in this lawsuit and has "insinuated his intended use of discovery materials for extra-judicial purposes."  (*Id.* at 18).

In response, Plaintiff does not dispute Plaintiff's assertions regarding his intent to use the documents for extra-judicial purposes. He notes that PSU publicized the investigation's conclusions in its public Answer.  (Doc. 38 at 18).  Accordingly, he contends that responding to public accusations is a fundamental right.  (*Id.*).  Plaintiff states that "[t]he OEC Report and supporting documents are essential for proving pretext."  (*Id.*).

32

We find *Manco, supra,* instructive as to this factor. 350 F.R.D. at 67. In *Manco*, the Plaintiff indicated that he wished to publicly disclose the investigative report at issue in a motion for a protective order to "publicly clear his name." *Id.* The court stated: "Plaintiff may seek to clear his name by prevailing in the litigation, but the Court does not concern itself with his attempt to litigate the case in the public eye." *Id.* We agree. Nothing in this Opinion should be construed as limiting Plaintiff's ability to use the OEC Report or associated documents to establish any element of his claims. But his desire to publicly disseminate those materials to "litigate the case in the public eye" does not persuade us that this *Pansy* factor weighs in favor of denying Defendants' Motion. Rather, we find that this factor likewise weighs in favor of protection. *See Manco*, 350 F.R.D. at 67.

    D.    <u>Fourth *Pansy* Factor: Whether the Sharing of Information Among the Litigants will Promote Fairness and Efficiency</u>

We find this factor to be neutral. As previously discussed, there is no indication that Defendants are seeking to withhold any information from Plaintiff. Rather, they have indicated that they have shared or are prepared to share the requested materials with Plaintiff but seek a limitation on Plaintiff's ability to disclose the materials. (Doc. 39 at 18).

E.    Fifth *Pansy* Factor: Whether Confidentiality is Being Sought Over Information Important to Public Health and Safety

Here again, Defendants do not apply the fifth *Pansy* factor to each separate category of documents, but rather provide a short analysis of this factor, which apparently, should apply to all categories. Defendants assert that the documents sought to be protected do not implicate public health or safety.  (Doc. 37 at 21).  Plaintiff fails to even reference this factor.  (*See generally*, Doc. 38).

Based upon the information provided by the parties regarding each category of documents sought to be protected, it does not appear that there is any information in the requested documents that contains information important to the public health and safety.  Accordingly, this factor weighs in favor of protection.  *See Manco*, 350 F.R.D. at 67 ("Because the report does not contain information important to public health and safety, [this] *Pansy* factor weighs in favor of retaining the confidentiality designation.").

F.    Sixth *Pansy* Factor: Whether a Party Benefitting from the Order of Confidentiality is a Public Entity or Official

Here again, neither party applies this factor to each separate category of documents sought to be protected.  Rather, each party

34

provides only a brief analysis that we will assume is meant to apply to each category.  Defendants maintain that PSU's status as a "partially publicly funded [u]niversity" does not "outweigh the consideration due to non-party students, faculty members, and staff, whose emails or recorded statements, records or files may have been made relevant to this litigation through the course of the OEC investigation or during Plaintiff's ongoing employment with Penn State . . ."  (Doc. 37 at 24). They assert that it "is the private members of the Penn State community, not the university, who will 'benefit[] from the order of confidentiality.'"  (*Id.*) (citing *In re Avandia*, 924 F.3d at 671).

Plaintiff counters by asserting that PSU's status a "state-related university" creates a "strong mandate for transparency."  (Doc. 38 at 17) (citing *Shingara v. Skiles*, 420 F.3d 301, 308 (3d Cir. 2005)).  He further argues that the public has "profound interests in how a major university handles disability discrimination and whether its post-Freeh Report accountability mechanisms (the OEC) function properly or are used as tools of retaliation."  (*Id.* at 17).

Plaintiff is correct that where the entity benefitting from a protective order is a public official, this *Pansy* factor weighs against a

35

protective order.  *See Shingara*, 420 F.3d at 308.  But *Shingara* is not directly applicable here.  In *Shingara*, the only parties benefitting from the protective order at issue were public officials.  *Id.* at 308.  By contrast, here, while PSU will undoubtedly benefit from the protective order, we agree with Defendants that the primary beneficiaries are the individual students, faculty members, and staff, who provided information relevant to the investigation of Plaintiff.  And in *Manco*, the court found that where the parties benefitting from a protective order were students who initiated or participated in the investigation of a university professor, this *Pansy* factor weighed in favor of protection. *Manco*, 350 F.R.D. at 67.

Because the beneficiaries of sought protective order include both PSU, a "partially publicly funded university," and private parties, we find this sixth *Pansy* factor to be neutral.

G.    Seventh *Pansy* Factor: Whether the Case Involves Issues Important to the Public

Finally, as to this last factor, the parties provide only a general analysis and do not apply it to each individual category of documents sought to be protected.  Defendants assert that this case does not involve issues important to the public but rather is a routine

36

employment discrimination case.  (Doc. 37 at 25).  They further argue

PSU's status as a semi-public entity does not make this final factor

dispositive.  (*Id*.).  Defendants assert that courts have found that the

public has a strong interest in keeping investigatory processes of

publicly funded institutions confidential.  (*Id*.) (citing *Humphries*, 2022

WL 3107914, at *3; *Rosenblit*, 2021 WL 288887, at *7; *McKenna*, 2000

WL 1521604, at *2).

Plaintiff combines his analysis of the seventh *Pansy* factor with

his analysis of the sixth *Pansy* factor.  (Doc. 28 at 17).  As noted *supra*,

he argues that PSU's status as a "state-related" university creates a

"strong mandate for transparency" and the public has a profound

interest in PSU's handling of disability discrimination.  (*Id*. at 17).

Both parties' arguments as to this final factor are well-taken.  The

public has a compelling interest in keeping investigatory processes

confidential.  *See Rosenblit*, 2021 WL 288887, at *7 (the public has an

interest in keeping the [public entity defendant's] investigatory process

confidential); *McKenna*, 2000 WL 1521604, at *2 (explaining that the

public has a "wide-reaching interest in maintaining the confidentiality

of these documents that involves protecting people who provide

37

information to investigators and protecting the investigative process, itself"); *Humphries*, 2022 WL 3107914, at *4. Public disclosure of investigation materials could discourage future complainants and witnesses from coming forward. *Rosenblit*, 2021 WL 288887, at *7.

The public also has a strong interest in seeking "unlawful discrimination eradicated from its public employers because employment discrimination could be a sign of more widespread discrimination." *Rosenblit*, 2021 WL 288887, at *7; *see also McKenna*, 2000 WL 1521604, at *2 ("Evidence of discrimination within the ranks may be an indication of the treatment received by the public at-large.").

As the Court found in *Humphries*, based upon the important competing public interests at stake, we find this last factor to be neutral. 2022 WL 3107914, at *4.

H.    Balancing the *Pansy* Factors

1. Category 1: Statutorily Protected Information

With respect to Defendants' argument for protection of documents covered by FERPA, including pages 7-12, 15-16, 20-21, 23-24, 30-31, 33-37, 57-78, 80, 83-87, 90, 93, 97-100, 110, 113-115, 152-157, 166-170 of

the OEC Report[8], the *Pansy* factors all either weigh in favor of protection or are neutral.  Accordingly, we will grant Defendants' Motion for a Protective Order as to this category of documents.

2.  Category 2: Plaintiff's Medical Records

The parties failed to provide us with any meaningful analysis as to this category of documents.  We note that generally, when, as here, a plaintiff puts his mental and emotional health at issue (*See* Doc. 24, ¶¶ 130, 152, 170, 192), he waives the protection of the doctor-patient privilege with respect to his medical records.  *See Hammill v. Twin Cedars Senior Living, LLC*, No. 3:20-CV-231, 2020 WL 5082570, at *2 (M.D. Pa. Aug. 27, 2020).  However, courts also recognize plaintiffs' interest in maintaining the confidentiality of medical records and may order that such records be produced subject to a confidentiality order. *Id.* at *3.  Thus, finding that the other *Pansy* factors do not outweigh the privacy interests[9] attendant to medical records and because

---

[8] As discussed above, certain portions of the OEC Report do not constitute "education records," so as to fall within FERPA.

[9] We note, however, that the privacy interest in these records belongs to Plaintiff.  To the extent he does not wish for them to be treated as confidential, he may challenge such designation through the procedures set forth in the accompanying Order and we expect

Plaintiff failed to provide any argument in opposition to Defendants' Motion for a Protective Order as to this category, we will grant Defendants' Motion for a Protective Order over this category of documents as unopposed.

### 3.  Categories 3 and 4: The OEC Report and Related Documents

As to the OEC Report and related documents, all *Pansy* factors either weigh in favor of protection or are neutral.  Accordingly, we will grant Defendants' Motion for a Protective Order as to this category with the exception of the following portions of the OEC Report: Appendix A: August 14, 2023, Letter from Eisenberg & Baum regarding Dr. Valente, Page 82; Appendix F: December 20, 2024, Memorandum from Dean Kimberly Lawless to Dr. Valente, Pages 101-102; Appendix G: January 6, 2025, Email from Dr. Valente to Dean Kimberly Lawless, Pages 103-108; Appendix K: February 14, 2025, Dr. Valente's Complaint in this matter, Pages 118-144; Appendix M: March 26, 2025, Email from Dr. Valente to Erik Kochanowski, Pages 148-149; Appendix N: December 20, 2013, Letter from Affirmative Action and Diversity Education Office

---

Defendants to be guided by this note in responding to any such challenge.

to Dr. Valente, Pages 150-151; Appendix Q: December 20, 2024, Letter from Dean Lawless to Dr. Valente, Pages 158-159; Appendix R: January 6, 2025, Dr. Valente email to Dean Lawless, Pages 160-165.  Good cause does not exist to enter a protective order as to those portions of the OEC Report, as they are already within the public domain or in Plaintiff's possession from sources other than Defendants.

#### 4. <u>Category 5: Personnel Files and Related Documents for Faculty and Staff Other than Valente</u>

As to this category as well, the *Pansy* factors weigh in favor of affording protection.  Accordingly, Defendants' Motion for a Protective Order will be granted as to this category of documents.

#### 5. <u>Category 6: Complaints Raised About Plaintiff by Students, Faculty, and Staff</u>

The *Pansy* factors likewise weigh in favor of affording protection to this category.  Accordingly, Defendants' Motion for a Protective Order will be granted as to this category of documents.

#### 6. <u>Category 7: Any Documents Pertaining to Current or Former Students</u>

Because Plaintiff provided no meaningful response to this category of documents, we deem Defendants' Motion for a Protective Order as to this category unopposed.  However, we find that this

category is overly broad and Defendants failed to satisfy their burden that good cause exists for a protective order.  The parties should be guided, in any event, by our analysis as to documents that fall within the scope of FERPA and are encouraged to work together, going forward, to try and resolve disputes regarding treatment of such documents.

       7.   Category 8: Electronic Communications Among Penn State Students, Faculty, or Staff (PSU Policy AD53)

Again, with respect to this factor the *Pansy* factors weigh in favor of protection.  Accordingly, Defendants' Motion for a Protective Order will be granted as to this category of documents.

## IV.   CONCLUSION

For the reasons set forth herein, Defendants' Motion for a Protective Order (Doc. 36) will be granted in part and denied in part. The Motion is granted with respect to those portions of the OEC Report protected by FERPA; Plaintiff's medical records; the OEC Report and related documents, excluding those portions of the OEC Report identified above; personnel files of faculty and staff other than Plaintiff; complaints raised about Plaintiff by students, faculty and staff; and

42

electronic communications made pursuant to PSU Policy AD53. The Motion for a Protective Order is denied as to "any documents pertaining to current or former students."

We direct the Parties to carefully review the Order filed in connection with this Memorandum. At this juncture, we decline to address the propriety or impropriety of attaching any material designated as confidential to future filings. As the Third Circuit pointed out in *In re Avandia*, the common law right of access standard is distinct from the Rule 26 standard governing confidentiality orders. 924 F.3d at 669. To the extent either party wishes to publicly file materials designated as confidential, the protocol for doing so is outlined in the Order. Any party opposing such filing must file a motion and supporting brief articulating the justification for sealing any such documents.

Finally, we take this opportunity to advise the parties of our expectation that they engage in good faith efforts to resolve discovery disputes without court intervention. Here, both parties took a hardline, categorical "all-or-nothing approach." The parties' briefing reveals that there were clearly categories of documents that the parties could have

and should have agreed were appropriate for a protective order.  For example, Plaintiff provides no arguments in opposition to Defendants' request for a protective order over his medical records.  Similarly, we note that while the OEC Report is 186 pages, that length is not exorbitantly long so as to preclude a more precise analysis.  For example, there can be no credible argument by Defendants that the twenty-six pages of the OEC report that include a copy of Plaintiff's complaint merit the confidentiality provided by a protective order.  Indeed, Defendants' Proposed Protective Order contemplates as much. (*See* Doc. 36-4 at ¶ 4).

Going forward, the Court expects that to the extent there is a discovery dispute, the parties will engage in a more fulsome, good-faith effort to resolve it.  Where the parties come to an impasse, any dispute presented to the court should be narrow and fully framed for the court's review.

**Date: March 6, 2026**                    *s/ Leo A. Latella*
                                           **LEO A. LATELLA**
                                           **United States Magistrate Judge**